UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

UNITED STATES OF AMERICA,

        Plaintiff,

v.

SAMEER GADOLA,

        Defendant.

_____/

Case No. 1:17-CR-00080-01

Hon. Janet T. Neff
United States District Court Judge

**SUPPLEMENTAL BRIEF IN SUPPORT OF DEFENDANT
SAMEER GADOLA'S MOTION TO SUPPRESS STATEMENTS
AND EVIDENCE DERIVED THEREFROM**

    In *Missouri v. Seibert*, 542 U.S. 600 (2004), the United States Supreme Court held that law enforcement officials may not question a suspect "in successive unwarned and warned phases" because "the midstream recitation of [*Miranda*] warnings" after eliciting a confession deprives the accused of any "real choice" regarding the waiver of Fifth Amendment rights. *Id*. at 604, 609, 612. The FBI used exactly that forbidden technique here, and candidly admits that it did so for the very purpose of defeating *Miranda*. Special Agent Henrik Impola—after a seven-month investigation and two affidavits finding "probable cause" to believe that Mr. Gadola had violated multiple criminal statutes—devised and executed a plan for CBP agents to interrogate him without *Miranda* warnings on topics related exclusively to those suspected crimes. Once Mr. Gadola made key admissions to those agents, Agent Impola then joined the interrogation, administered the warnings that CBP had withheld, and continued to interrogate him—personally at first and later with the assistance of a polygrapher—for well over six hours regarding the same subject matter. Agent Impola admitted in open court that he used this strategy to make it less likely that Mr. Gadola would invoke his *Miranda* rights. This carefully orchestrated plan to

undermine *Miranda* does not pass constitutional muster and requires the suppression of all of Mr. Gadola's statements, as well as the fruits thereof.

## STATEMENT OF FACTS

The FBI began its investigation of Mr. Gadola on May 23, 2016. *2/14/18 Suppression Hr'g Tr. Vol. II*, ECF No. 76, PageID.513. During the next six months, FBI Special Agent Impola obtained six search warrants for Mr. Gadola's social media and Verizon accounts, his residence, and his electronic devices. *Id*., ECF No. 76, PageID.447-48. Although Agent Impola testified at the hearing that he did not have probable cause as of January 5, 2017 to believe Sameer Gadola had committed a crime, this testimony is in direct contradiction with statements Agent Impola made, under penalty of perjury, to two Magistrate Judges. *See Search Warrants*, Def.'s Ex. B, at 2 & Ex. C, at 2. In those warrant affidavits, Agent Impola averred that he had probable cause to believe Mr. Gadola had violated multiple criminal statutes. *Id*.

Although Agent Impola had a warrant for Mr. Gadola's electronic devices, he "wanted to get the pass codes and get into the electronic media . . . ." 2/14/18 *Suppression Hr'g Tr. Vol. II*, ECF No. 76, PageID.461. He also wanted Mr. Gadola to take a polygraph. *Id*. And he needed to separate Mr. Gadola from his lawyer-parents. *Id*., ECF No. 76, PageID.457; 1/4/18 *Suppression Hr'g Tr. Vol. I*, ECF No. 73, PageID.427. So, he developed a "very carefully mapped out and orchestrated" plan to use Customs and Border Patrol ("CBP") to question Mr. Gadola without benefit of *Miranda* rights. *1/4/18 Suppression Hr'g Tr. Vol. I*, ECF No. 73, PageID.426-27. In fact, using CBP to conduct an un-*Mirandized* interrogation as part of an ongoing criminal investigation is a "common" practice that happens "very frequently." *Id*., ECF No. 73, PageID.320-21, 355-56.

CBP knew Agent Impola had obtained multiple search warrants for Mr. Gadola's electronic devices. *Id.*, ECF No. 73, PageID.347. Agent Renaud knew that a warrant requires a finding of probable cause that a crime has been committed. *Id.*, ECF No. 73, PageID.349. And Agent Impola fully expected CBP to "broach the topic of child pornography and anything related to my investigation, child traveler, child enticement cases." *2/14/18 Suppression Hr'g Tr. Vol. II*, ECF No. 76, PageID.456-57. He also was aware that CBP did not administer *Miranda* in the secondary inspections. In fact, Agent Impola admitted CBP's interrogation was "all predicated on a child enticement, child traveler case, and it would be an ordinary inspection pertaining to that type of case," *id.*, ECF No. 76, PageID.461-62, without the usual *Miranda* warnings:

> [W]e were concerned that, number one, a search warrant at a residence is intrusive, and I believed would be more likely to cause him to invoke his right to counsel and decline to provide the pass code to his devices.

*Id.*, ECF No. 76, PageID.478-79.

When CBP Agent Renaud pulled Mr. Gadola into secondary inspection, he only did so because the FBI asked him to. *1/4/18 Suppression Hr'g Tr. Vol. I*, ECF No. 73, PageID.342. He did not suspect Mr. Gadola was a terrorist, an immigrant, or violating customs laws. *Id.*, ECF No. 73, PageID.342-43. He asked Mr. Gadola no questions about his identity, nationality, or customs issues. *Id.*, ECF No. 73, PageID.343-44. CBP did not even look at Mr. Gadola's devices. *Id.*, ECF No. 73, PageID.345. The Agents merely obtained the passcodes from Mr. Gadola and handed the devices to the FBI. *Id.*

CBP agents then proceeded to interrogate Mr. Gadola for 30 minutes, with questions focused exclusively on the allegations of child pornography and exploitation. *Id.*, ECF No. 73, PageID.347, 365. Agent Renaud admitted that typical secondary inspection interviews are not 30 minutes of questioning about child pornography. *Id.* Mr. Gadola was not free to leave. *Id.*,

ECF No. 73, PageID.432. Nor was he given *Miranda* warnings. Indeed, during his nine years as a law enforcement officer, Agent Renaud has **never** given *Miranda* warnings. *Id*., ECF No. 73, PageID.339.

After the 30 minutes of interrogation, CBP agents informed Agent Impola of Mr. Gadola's statements and invited him into the room. *Id*., ECF No. 73, PageID.333. At that point, Agent Impola finally read Mr. Gadola his *Miranda* rights, informing him that anything he said would be used against him. *Id*. In giving that warning, Agent Impola did not exclude the statements Mr. Gadola had just given to CBP. *Id*., ECF No. 73, PageID.334. He then proceeded to interrogate Mr. Gadola for another five-and-a-half hours, with the help of a polygraph examiner. *1/4/18 Suppression Hr'g Tr. Vol. I*, ECF No. 73, PageID.415.

Agent Impola never informed Mr. Gadola that his parents asked to speak with him. *2/14/18 Suppression Hr'g Tr. Vol. II*, ECF No. 76, PageID.488. And he refused Mr. and Mrs. Gadola's requests to sit with their son, as attorneys, even after he learned that Sameer Gadola suffered from learning disabilities. *Id*., ECF No. 76, PageID.474-75. "I wasn't going to get [a lawyer] or allow somebody else to interfere in the interview." *Id*. Agent Impola did nothing to ensure that Mr. Gadola, given his limitations, understood the nature and consequences of the constitutional rights he was waiving. *Id*., ECF No. 76, PageID.474.

After an hour-and-a-half of additional questioning in the same CBP secondary inspection room, Agent Impola transported Mr. Gadola to the FBI's Detroit office for a polygraph examination. *Id*., ECF No. 76, PageID.473. Agent Impola "brief[ed]" Agent FitzGerald, the polygraph examiner, on Mr. Gadola's "admissions" at the airport so that Agent FitzGerald could follow up on that information and "conduct an effective polygraph." *Id*., ECF No. 76, PageID.514, 516.

4

Agent Impola did not mention the concerns regarding Mr. Gadola's intellectual functioning. *Id*. at 521.

**BURDEN OF PROOF**

"[T]he burden of showing admissibility rests, of course, on the prosecution." *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004) (quoting *Brown v. Illinois*, 422 U.S. 590, 604 (1975)).

**ARGUMENT**

The Court should suppress not only statements and evidence obtained from CBP's un-*Mirandized* interrogation, but also all statements and evidence obtained by the FBI after *Miranda* warnings were given. As previously explained, CBP was required to give *Miranda* warnings because it knew probable cause existed under the FBI's warrant and directed all of its questions toward the offenses alleged in the warrant, resulting in an interrogation "focused" on the accused. *See United States v. Galloway*, 316 F.3d 624, 631 (6th Cir. 2003); Reply Br. in Supp. of Def.'s Mot. to Suppress, ECF No. 69. CBP's failure to administer *Miranda* warnings requires the pre-warning statements and fruits thereof to be suppressed. *Id*. Because this point was fully briefed in Mr. Gadola's previous reply brief, this supplemental brief focuses solely on the FBI's post-warning interrogation. That interrogation likewise violated *Miranda*, but for a different reason.

In *Missouri v. Seibert*, 542 U.S. 600 (2004), law enforcement openly admitted that the question-first tactic employed there was designed to undermine the effectiveness of the warnings. Justice Souter, writing for a plurality, agreed that such a strategy is likely to work:

> [I]t is likely that if the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in

5

> content. . . . Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again. A more likely reaction on a suspect's part would be perplexity about the reason for discussing rights at that point, bewilderment being an unpromising frame of mind for knowledgeable decision. What is worse, telling a suspect that "anything you say can and will be used against you," without expressly excepting the statement just given, could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silence being of no avail.

*Seibert*, 542 U.S. at 613. Because such warnings fail to provide the accused with an informed choice, Justice Souter concluded "there is no practical justification for accepting [them] as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment." *Id*. at 612.

The FBI used the exact same question-first strategy against Mr. Gadola, and it presumably had the same effect. It is the Government's burden to prove otherwise. Under the factors discussed below, the Government must show that the post-warning interrogation was so distant in time and different in content that *Seibert*'s logic does not apply. Because there is no meaningful distinction between this case and *Seibert*, the Government cannot carry its burden.

I. **Under *Seibert*, the Court applies a multi-factor test to determine whether the warnings were as effective as *Miranda* requires.**

Justice Souter began his analysis in *Seibert* by contrasting Seibert's interrogation to the one in *Oregon v. Elstad*, 470 U.S. 298 (1985), which started with an "innocent neglect of *Miranda*" in a "living room conversation" followed by a carefully *Mirandized* station house interrogation. *Seibert*, 542 U.S. at 615. In that earlier case, the "causal connection between the first and second responses to the police was 'speculative and attenuated,'" and the "good-faith *Miranda* mistake" was "not only open to correction by careful warnings before systematic questioning," but also "pos[ed] no threat to warn-first practice generally." *Id*. *Seibert* presented the

6

"opposite extreme": the entire interrogation occurred in the custodial environment of a police station, in successive warned and unwarned phases covering the same ground, with only 15 to 20 minutes in between. *Id.* at 616.

The court distilled from these two extremes "a series of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object:

> [1] the completeness and detail of the questions and answers in the first round of interrogation,
>
> [2] the overlapping content of the two statements,
>
> [3] the timing and setting of the first and the second,
>
> [4] the continuity of police personnel, and
>
> [5] the degree to which the interrogator's questions treated the second round as continuous with the first."

*Id*. at 615. These factors determine whether the second round of warned questioning presents such "a new and distinct experience" from the first round of unwarned questioning that the belated *Miranda* warnings would still function as effectively as *Miranda* requires, despite the prior confession. *Id*. The Sixth Circuit adopted Justice Souter's multi-factor test in *United States v. Ray*, 803 F.3d 244, 272 (6th Cir. 2015).

When the Government deliberately employs a question-first tactic, as it did here, it should be assumed *Seibert* applies, unless the Government proves otherwise. After all, it is the Government's burden to prove the statements are admissible. It is not enough for the Government to show that there is a difference between *Seibert* and this case under the above factors. The Government must instead show that one or more of those factors made the second round of questioning such a meaningfully different experience that it calls for a different result from *Seibert*. The Government cannot make that showing here.

7

## II. The Government cannot show that this case is so distinct from *Seibert* that it calls for a different result.

Applying the factors above does not show the warnings given immediately after making confessions to CBP—or 40 minutes after the ride to the FBI's office—should be perceived any differently from the way they were perceived in *Seibert*. The factors instead reveal a well-orchestrated police strategy of the sort derided in *Seibert*, one designed "to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them." 542 U.S. at 611. This is not surprising, given that Agent Impola admitted his tactic was specifically designed to make it less likely that Mr. Gadola would invoke his constitutional rights.

First consider the overlapping content of the first and second rounds of questions and answers. Prior to the administration of any *Miranda* warnings, CBP spent 30 minutes asking Mr. Gadola about: (1) the "contents of his phone," (2) his "contact with children" and "use of social media," (3) his "problem with child pornography," and (4) whether he had "a sexual encounter with a minor." 1/4/18 *Suppression Hr'g Tr. Vol. I*, ECF No. 73, PageID.331-33, 361-63. Their interrogation was devoid of any customs-related concern and instead covered the production, receipt, and enticement offenses that Mr. Gadola is accused of committing. After Mr. Gadola made key admissions in response to all of these questions, Agents Impola and FitzGerald merely fleshed out the details of the conduct to which Mr. Gadola had already admitted. Agent Impola "ask[ed] about the same kind of things" as CBP, such as Mr. Gadola's social media communications and physical contact with minors. *Id*. at PageID.407; 2/14/18 *Suppression Hr'g Tr. Vol. II*, ECF No. 76, PageID.467. And Agent FitzGerald focused his exam on the sexual contact that Mr. Gadola had allegedly admitted to CBP. 2/14/18 *Suppression Hr'g Tr. Vol. II*, ECF No. 76, PageID.527-28. While the second five-and-a-half-hour round of questioning went into greater detail than the first, the Sixth Circuit has held that "new" or "amplifying" questions

8

still trigger *Seibert* as long as they are "along similar lines" to the subject matter covered pre-*Miranda*. *United States v. Ray*, 690 F. App'x 366, 373 (6th Cir 2017); *accord United States v. Pacheco-Lopez*, 531 F.3d 420, 428 (6th Cir. 2008) (finding *Seibert* violation where agent asked follow-up questions based on "knowledge gleaned" from initial interview).[1]

Consider also the timing and setting of the interrogations. In *Seibert*, law enforcement conducted both the unwarned and post-warning interrogations in a custodial environment, the station house. 542 U.S. at 616. The same was true in *United States v. Ashmore*, where officers in a sting operation questioned the suspect about weapons in his car without *Miranda* warnings after ordering him out of the car and handcuffing him. 609 F. App'x 306, 308-09 (6th Cir. 2015) (reaching the same result as *Seibert*). Contrast this with *Elstad* and *Coomer v. Yukins*, 533 F.3d 477 (6th Cir. 2008). In *Elstad*, the pre-warning questioning occurred during a brief pause in the living room during a search of the home, while the post-warning questioning occurred at the station house after careful *Miranda* warnings. 470 U.S. at 315. Similarly, in *Coomer*, officers obtained a confession from the defendant at her kitchen table after telling her "she was not under arrest, and importantly, that if she asked them to leave, they would go." 533 F.3d at 482. Four hours later, after transporting Coomer to the station and escorting her into an interrogation room, Sergeant Kucyk told Coomer that "the circumstances had changed, that she was now in custody, and that he was required to read her *Miranda* rights." *Id.* The initial questioning was neither designed to elicit a confession nor conducted in government quarters or custody, and the warnings and second round of questioning came hours later in a different environment.

---

[1] *Bobby v. Dixon*, 565 U.S. 23, 31 (2011), presents a fine example of meaningful differences between the content of the first and second round of questions and answers. The officers there obtained a confession of forgery before warnings were given, but there was no "nexus" between that confession and the later warned confession to murder. *Id.*; see also *United States v. Miller*, 562 F. App'x 272, 287 (6th Cir. 2014).

9

Here, Mr. Gadola was first sequestered in a government room where he was not free to leave, *id*., ECF No. 73, PageID.432, then questioned for 30 minutes without *Miranda* warnings, *id*., ECF No. 73, PageID.347, 365. When that resulted in key admissions, he was immediately warned and questioned again for an hour and a half about what he had just said. All of this occurred in the same isolated, secondary-inspection environment.

The only marked difference between this case and *Seibert* is that the second interrogation was followed by a 40-minute drive to the FBI office in Detroit for a polygraph examination. That break was only consistent with Agent Impola's pre-*Miranda* conversation with Mr. Gadola about taking a polygraph exam in Detroit in order to "clear up" what he had said to CBP. Gov't Ex. 2. This setup was explicitly designed to portray the polygraph exam as a natural extension of the un-*Mirandized* interrogation that had preceded it. And even without such a link, the Sixth Circuit has found *Seibert* violations in the face of a 45-minute break in questioning. *See Ray*, 690 F. App'x at 374. Other courts have found *Seibert* violations with breaks as long as 90 minutes. *See United States v. Capers*, 2007 WL 959300, at *13 (S.D.N.Y. Mar. 29, 2007). This case falls well within those parameters.

In addition, there was continuity in police personnel throughout the interrogations. The CBP agents who initially questioned Mr. Gadola remained in the room throughout Agent Impola's interrogation because Officer Schmelz had already developed a "really good rapport" with him. 1/4/18 *Suppression Hr'g Tr. Vol. I*, ECF No. 73, PageID.365. Agent Impola then befriended Mr. Gadola and hand-delivered him to Agent FitzGerald, making sure that he remained in the polygraph suite until Mr. Gadola executed the polygraph consent form. And to cement the continuity, Agent Impola returned for another 50-minute round of questioning at the conclusion of the exam. Again, this weighs in favor of suppression, as the Sixth Circuit has held

10

that questioning need not be conducted by the "same officer" as long as there is a "practical continuity of police personnel." *Ray*, 690 F. App'x at 375-76. Agent Impola made sure that connectedness existed at each successive stage of Mr. Gadola's interrogation.

Finally, the questions posed to Mr. Gadola after the administration of *Miranda* warnings were continuous with those asked previously. Agent Impola's first question to Mr. Gadola, for example, was about his "problem" with child pornography, as relayed to CBP agents. Gov't Ex. 2. That same "problem" was explored by Agent FitzGerald. 2/14/18 *Suppression Hr'g Tr. Vol. II*, ECF No. 76, PageID.533. Each round of questioning simply incorporated what preceded it because it was all part of Agent Impola's sequenced plan to: (1) isolate Mr. Gadola from his parents and obtain initial admissions through interrogation by CBP; (2) reinforce those admissions by downplaying their significance and pretending to offer him assistance as a friend; and (3) extract any additional information through a polygraph that he was told would "clear up" his pre-*Miranda* admissions. It is "unrealistic to treat [these three] spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because *Miranda* warnings formally punctuate them in the middle." *Seibert*, 542 U.S. at 614.

On the whole, what ultimately seals the fate of the statements and evidence obtained here is the fact that Agent Impola administered the warning immediately after Mr. Gadola made the key admissions, then continued to question him on what he just discussed with CBP. Had Agent Impola informed Mr. Gadola that none of the statements just given to CBP could be used against him, the outcome would be different. But Agent Impola warned Mr. Gadola that "anything you say can and will be used against you," minutes after he made statements to the CBP, "without expressly excepting the statement[s] just given." *Id*. at 613. This is exactly the sort of mid-

stream warning that would easily "lead to an entirely reasonable inference that what he has just said will be used, with subsequent silence being of no avail." *Id*. It was particularly likely to have that perverse effect here because of Mr. Gadola's jet lag, exhaustion, and mental disability.[2]

## CONCLUSION

The Government's strategy of using CBP to obtain an unwarned confession and then immediately warning Mr. Gadola that his statements could be used against him was exactly the sort of strategy denounced in *Seibert*. Because using the evidence obtained during the course of this interrogation would violate Mr. Gadola's Fifth Amendment rights, all such evidence must be suppressed.

Dated: March 1, 2018

/s/ Gaëtan Gerville-Réache
Brian P. Lennon (P47361)
Madelaine C. Lane (P71294)
Gaëtan Gerville-Réache (P68718)
Warner Norcross & Judd LLP
111 Lyon St. NW, Ste. 900
Grand Rapids, MI 49503
(616) 752-2000
blennon@wnj.com; greache@wnj.com;
mlane@wnj.com

Thomas W. Cranmer
David Danny O'Brien
Miller Canfield Paddock & Stone PLC
840 W Long Lake Rd., Ste. 200
Troy, MI 48098
(248) 267-3381
cranmer@millercanfield.com
obrien@millercanfield.com

16850381

*Attorneys for Defendant Sameer Gadola*

---

[2] *See 2/14/18 Suppression Hr'g Tr. Vol. II*, ECF No. 76, PageID.474-75 (Testimony of Agent Impola admitting that Mr. Gadola's parents informed him at the airport that Mr. Gadola had developmental disabilities); *Preeti Gadola Aff.* ¶¶ 3–8, ECF No. 33-2, PageID.114-15 (averring that Sameer has developmental disabilities and was awake for 21 straight hours before boarding the plane for departure from India, then awake for 18 of the next 22 hours on the two flights to the U.S.; he had only slept 4 of the previous 43 hours when he was led away for questioning).