UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:17-CR-00080-01 |
| Plaintiff, | Hon. Janet T. Neff |
| v. | United States District Court Judge |
| SAMEER GADOLA, | |
| Defendant. | |

_____/

# DEFENDANT SAMEER GADOLA'S SENTENCING MEMORANDUM AND REQUEST FOR VARIANCE SIGNIFICANTLY BELOW THE ADVISORY SENTENCING GUIDELINE RANGE

On March 30, 2018, pursuant to the terms of a non-negotiable written plea agreement offered by the government, defendant Sameer Paul Gadola ("Mr. Gadola" or "Sameer") pled guilty to a Superseding Felony Information charging three counts of possession of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and 2252A(b)(2).  There is no dispute that all of the charges stem from Mr. Gadola's on-line communication with young men—ages 13 to 16 at the time—that resulted in Mr. Gadola and the young men sharing pictures of their respective genitalia. (Dkt. 81, Plea Agt., PageID 621-626).  None of the images that Mr. Gadola possessed were of prepubescent children, and not a single image could be characterized as a sexually suggestive child image, sexually explicit pose, explicit sexual act, or image depicting violence, which typically result in federal prosecution.  Moreover, there is no dispute that Mr. Gadola never shared any of

the genital photos of any of the young men with others or met any of these victims.[1]  His sentencing hearing is scheduled for September 10, 2018.  The Presentence Report ("PSR") calculates Mr. Gadola's advisory Sentencing Guideline range to be 188-to-235 months.  Mr. Gadola respectfully submits this sentencing memorandum for the Court's consideration, and asks for a variance resulting in a sentence significantly below the advisory Sentencing Guideline range.

## Sentencing Considerations

Mr. Gadola is 23 years old.  (Dkt. 100, PSR, PageID 740, ¶ 100.)  The conduct for which Mr. Gadola has accepted full responsibility occurred when he was 21 years old and living at home with his parents.  Since his arrest at the Detroit Airport's International Terminal in January 2017, as Mr. Gadola and his family returned home to Michigan from India where they visited the orphanages where Sameer and his younger sister were born, Mr. Gadola has been on home detention.  While most 23 year olds are celebrating their college graduation, moving into their first apartment, and starting their careers, these are milestones not in Mr. Gadola's immediate or long-term future, even without his federal sentencing looming.  While on home detention for the past 19 months, Mr. Gadola's access to the outside world has been limited to weekly mass, visits with his counselors and therapists, appearances in Court, and the approximately 60 days he spent in federal custody, primarily at a Federal Bureau of Prisons facility in Colorado, where he was assessed for his competency to assist with his defense.[2]  Throughout his life, and continuing to this

---

[1] Based on information and belief undersigned counsel believes that during the course of the government's investigation, the case agent, FBI Special Agent Hank Impola, presumably posing as an underage child, attempted to convince Mr. Gadola to meet him, which Mr. Gadola never did.

[2] On May 10, 2018, the Honorable Ray Kent granted the Defendant's Motion to Modify Bond Conditions, over the government's objection, to allow Mr. Gadola the opportunity to have two meals a month outside the home with his parents.  *See* Dkt. 94, Order Modifying Conditions of Bond, PageID 657.

day, Mr. Gadola has struggled with a number of personal and cognitive issues which have left him years behind his peers in terms of his mental maturity.  As described in detail below, Mr. Gadola does not function at the level of a normal, healthy 23-year-old man.  More importantly, he was not functioning at the level of a normal, healthy 21-year-old man at the time when these offenses occurred.

**I.      The history and characteristics of the Defendant.**

*1.   Mr. Gadola suffers from numerous health and cognitive conditions from birth.*

Mr. Gadola was born underweight and two and a half months premature in New Delhi, India.  (Dkt. 100, PSR, PageID 740, ¶ 100; Exhibit A, Letter from Dr. Roy Meland.)  He weighed just over two pounds at birth and weighed just eight pounds at six months of age when his parents, Michael and Preeti Gadola, adopted him.   Mr. Gadola receive injections of human growth hormones through adolescence, because his body failed to produce sufficient growth hormones. He never met his biological parents.  (Dkt. 100, PSR, PageID 740, ¶ 100.)

From a very young age, Sameer has suffered from numerous health issues. Over the years, Mr. Gadola has been diagnosed with: autistic spectrum disorder; attention-deficit/hyperactivity disorder (combined presentation); borderline intellectual functioning; specific learning disorder with impairment in mathematics; oppositional defiance; maturational and cognitive developmental delays including intellectual disability.  Additionally, since his adoption, he has had a documented history of failure to thrive.  (Dkt. 36, Forensic Psychological Evaluation of Jeffrey T. Kieliszewski, Ph.D., PageID 135, 140; Dkt. 60, Forensic Psychological Report of Dr. van der Walt, PageID 256-257; Ex. A.)  As a forensic psychological examination revealed, "[i]n the previous diagnostic nomenclature, [Mr. Gadola] would have readily met the criteria for a Pervasive Developmental Disorder."  (Dkt. 36, Kieliszewski Eval. PageID 140.)   Dr. Roy Meland—a board certified psychiatrist who has been providing care to Mr. Gadola for the past five years—notes that

3

throughout his life, Mr. Gadola has demonstrated "social impulsiveness, obsessive and compulsive thoughts and behaviors, challenges in developing and maintaining age appropriate peer relationships, and social unawareness." (Ex. A.)

Dr. Jeffrey T. Kieliszewski, a forensic psychologist, concluded that Mr. Gadola has "significant intellectual deficits operating." (Dkt., 36, Kieliszewski Eval., PageID 140.) As Dr. Kieliszewski reports, "[i]ndividuals with Borderline Intellectual Functioning also frequently have tendencies towards being emotionally immature and potentially acting younger than their age. In a sense, they are often times delayed in their emotional development." (*Id*.) Dr. Sunil Pasricha, Mr. Gadola's uncle, notes that Mr. Gadola "matured into an adolescent, but then stopped, mentally." (Exhibit B, Letter from Dr. Sunil Pasricha.)

In Dr. Kieliszewski's opinion, Mr. Gadola's current cognitive development is equivalent to that of a preteen or early teen. (Dkt. 36, Kieliszewski Eval., PageID 140.) Consequently, he has difficulty thinking of and developing novel solutions for dynamic problems. (*Id.*). Due to his delayed cognitive maturation and mental condition, he has struggled in multiple areas of his life. (*Id*. at pp. 3-4 (noting academic and social difficulties.)) Dr. Satya Paul Pasricha, Sameer's grandfather and a clinical psychiatrist, notes that Mr. Gadola's learning deficits were clear from a very young age. (Exhibit C, Letter from Dr. Satya Pasricha.) Dr. Satya Pasricha notes that "[i]n our country of origin, we would call him 'simple minded.' He reached milestones . . . much later than other children and he struggled with academics and relating to peers his own age." (*Id.*)

### 2. *Mr. Gadola required special education assistance from grade school to community college.*

Because of his cognitive delays, Mr. Gadola required educational accommodations throughout his educational journey. Mr. Gadola's kindergarten special-education teacher, Kelly Flagg, writes that Mr. Gadola was placed in her care because of his "failure to thrive adoption and

speech and language delays." (Exhibit D, Letter from Kelly Flagg.)  Mr. Gadola was fortunate to have adoptive parents who cared for him deeply and participated often in his education and development.  (*Id.* (noting that Mrs. Flagg and Mr. Gadola's mother "often brainstormed how we could best help Sameer with his delays, focus and attention.").)

In the early stages of his education, Sameer experienced difficulty in expressive and receptive language skills, requiring speech therapy.  (*Id.*) Throughout elementary and high school, Mr. Gadola received special education services for various subjects, including reading comprehension and mathematics. (Dkt. 100, PSR, PageID 745, ¶ 128; see also Dkt., 36, Kieliszewski Eval., PageID 135.)  His status allowed for various accommodations including a personal reader, additional study materials, and tape recorders for class discussions.

Despite these services, Mr. Gadola struggled in high school.  Mr. Gadola was mercilessly bullied for his status as a "special education" student.  (Exhibit E, Letter from Joan Curley-Vigor; see also Dkt. 100, PSR, PageID 741, ¶ 104.)  Despite the bullying and his struggles with "learning" and "maturity" in high school, Mr. Gadola "persevere[d]" and graduated at the age of nineteen. (Ex. E at p. 1.)  After high school, Mr. Gadola took classes at Lansing Community College.  (Dkt. 100, PSR, PageID 745, ¶ 130.)  Again, Mr. Gadola required special education services. (*Id.*) However, he continued to underperform and was ultimately placed on academic probation.  (*Id.*)

### 3.  Mr. Gadola's cognitive conditions have impacted his maturity.

Mr. Gadola's delayed cognitive development has also adversely affected his ability to live independently.  With the love and attention of his parents, and the considerable counseling and other resources his family has provided throughout his life, Sameer has indeed made considerable progress.  Nevertheless, he currently lacks the essential skills required to accomplish the daily living tasks necessary to live independently.  (Dkt. 36, Kieliszewski Eval., PageID 136.)  Mr.

Gadola lives with his parents, who likely will need to make provision for Sameer's care for the rest of his life.

It is well-documented that Mr. Gadola's autism adversely affects his social communication and interactions with others.  (*Id.*, PageID 140.)  Dr. Kieliszewski notes that Mr. Gadola has dependent personality characteristics—looking to others for guidance and security. (*Id.*, PageID 139.)  His Millon Clinical Multiaxial Inventory scores indicate a tendency to present himself in a desirable light at times.  (*Id.*)  Overall, Dr. Kieliszewski concludes that Mr. Gadola has a profound emotional immaturity and problems with social boundaries. (*Id.*)  Like many young offenders, usually finding themselves in state—not federal court—problematic internet use, also called compulsive Internet use, contributed to the offense conduct outlined in the PSR and Mr. Gadola's exchange of genital photos with young men under the age of 18.[3]

### 4. *Despite his many challenges, Mr. Gadola is a caring, involved member of the community.*

Mr. Gadola has unquestionably faced major disadvantages in his life, but he has turned his experiences into a positive by focusing on what he can be grateful for and pouring his love back into his school, residential, and church communities.  Mr. Gadola's neighbor writes that "[d]uring a very difficult time in my life, when my husband abandoned the family, Sameer's kind words and bright smile lightened my burden. [ . . . ] Sameer often helped [care] for our family dogs[.]  He would feed and walk the dogs . . . and was always a reliable pet sitter."  (Exhibit F, Letter from

---

[3] See U.S. Sentencing Commission's "2012 Report to the Congress:  Federal Child Pornography Offenses, Chapter 4, page 79 [https://www.ussc.gov/research/congressional-reports/2012-report-congress-federal-child-pornography-offenses] (citing Nathan A. Shapira et al.'s study entitled "Psychiatric Features of Individuals with Problematic Internet Use, 57 J. of Affective Disorders 267, 268 (2000).  "Problematic Internet ('PIU') or compulsive Internet use ('CIU') are generally thought of as an inability to stop using Internet technologies without experiencing distress and where such use has resulted in a significant negative impact."

Kathryn McCue Gillison.)  Members of Mr. Gadola's church note that Mr. Gadola "encouraged his friends in their college and athletic pursuits without jealousy" and was a "positive and upbeat friend" for their son.  (Exhibit G, Letter from Kirk and Kathryn Riley.)

## II.      No need to protect the public from further crimes.

Mr. Gadola is committed to doing everything he can to make certain he never ends up in this courtroom or before any judge again.  This includes any course of treatment (residential or out-patient) that the Court finds appropriate.  As noted above, Mr. Gadola has been in counseling for many years and has continued to participate in treatment while on pre-trial detention.  Recently, he was evaluated by Ronald Grooters and David Berghuis at Berghuis Psychological Services in Grand Rapids, Michigan, in an effort to determine Sameer's sexual interests in children and his likeliness to reoffend.  Mr. Grooters, who is often contracted by this court to make similar assessments of other defendants, had Sameer perform both the ABEL Assessment of Sexual Interests (AASI-2) and the Look Assessment for Sexual Interest and concluded that Mr. Gadola does not have a sexual interest in children and is unlikely to reoffend.  (Exhibit H, Ron Grooters' Report at pp. 5-6 (filed under restricted access).)

Not only is Mr. Gadola unlikely to reoffend, he is also extremely remorseful for his actions. He sincerely regrets communicating with minors and exchanging genital photographs on his phone.  He is committed to getting treatment and getting better because he knows that he needs help.  Dr. Meland writes that Mr. Gadola "has voiced remorse for his behavior and has demonstrated improved understanding of what is expected from him now and in the future."  (Ex. A.)  As previously noted, Mr. Gadola's family has "done a remarkable job with him given his challenges and are committed to his and the community's wellbeing."  (*Id.*)  Mr. Gadola's grandmother writes that Sameer is "very concerned about doing what has been expected of him

. . . .  He is aware of his situation and very sorry for his actions, and I feel confident he will conform to any rules set before him in the future." (Exhibit I, Letter from Joyce Gadola.)  Richard Johnston, a family friend and Mr. Gadola's baseball coach, writes:  "I don't think Sameer can fully verbalize how he feels and how remorseful he is but I see it in his body language.  He knows he let himself, his family, and his team down."  (Exhibit J, Letter from Richard Johnston.)  Kirk and Kathryn Riley, family friends and members of Mr. Gadola's church, write that "we continue to see Sameer regularly at our church, and he is open about his legal situation and his feelings of fear and remorse."  (Ex. G.)  Mr. Gadola has the distinct advantage of a large network of pro-social, supportive family and friends.  (Exhibits K and L, Additional Support Letters from Family and Friends.)  Their love and support will help him learn from this experience and is a distinct advantage Mr. Gadola enjoys over other similarly-situated defendants.  And with continued counseling in well-established and successful programs, continued abstinence from social media and other unregulated or unsupervised Internet communication, and continued support from his family and friends, Mr. Gadola can return to the positive and productive person he has always been prior to 2016, when he was 21 years old and began committing the offenses set forth in the Superseding Information.

### III.  Restitution is not appropriate here because there is no evidence that the three individuals (the children of the "J Family"), are "victims" under the terms of the mandatory restitution statute or the plea agreement.

Restitution is mandatory under 18 U.S.C. §§ 2259, 3663, 3663A.  Further, in the plea agreement, Mr. Gadola agreed to make full restitution to "all of the victims of his sexual exploitation of children, including, but not limited to, the children depicted in the images charged in the Superseding Felony Information, as well as the children who may appear in any other child

pornographic images produced, received, possessed, or accessed by the defendant.  (Dkt. No. 81, Plea Agreement, PageID 620.)

Mr. Gadola agrees that any restitution order is not restricted to the losses related to the three young men—ages 13 to 16 at the time—identified in the Superseding Information.  Indeed, the government contends that it has identified photographs of two other young men whose genital images Mr. Gadola possessed.  There is no dispute that these additional two individuals are "victims" for whom restitution would be owed both under the statute and pursuant to the written plea agreement.

After the plea hearing, the Government, for the first time, notified Mr. Gadola that it was requesting $66,472.38 in restitution for the benefit of three minor children—B.J., G.J., and S.J, all of whom are longtime family friends of the Gadola family and none of whom have been identified as individuals whose naked or otherwise pornographic images were ever in the possession of Mr. Gadola.  Apparently one or more of the J Family children now claim to be victims of sexual abuse or exploitation by Mr. Gadola, despite the fact there is no physical corroboration for these allegations and no finding (even of probable cause) that such allegations have merit.  It is also noteworthy that these allegations appear to have been raised by the J Family only <u>after</u> FBI Special Agent Hank Impola had one or more meetings with the parents of these children <u>before</u> a forensic interviewer purportedly met with the children.

None of these purported victims were noted in the Indictment, Superseding Indictment, or Superseding Felony Information.  They are all Michigan residents, and the State of Michigan has not filed any charges against Mr. Gadola based on these allegations.  To date, the government has provided no evidence, other than the uncorroborated statement of G.J, a 15-year old girl at the time (now an adult), that years ago Mr. Gadola exchanged images of his genitalia with her and she

shared "naked" images of herself with him.  The government has no images of child pornography of any of these minors—G.J or her siblings.  Indeed, one of the minors denies any sexual contact or exploitation by Mr. Gadola at all.  Even in the case of G.J., there is no indication of when she allegedly shared naked photographs of herself with Mr. Gadola.  Further, there is nothing in the reports shared with undersigned counsel that indicate the age of Mr. Gadola when he allegedly share images of himself with G.J.  Mr. Gadola denies that any inappropriate contact occurred with these children and denies producing, receiving, possessing, or accessing any pornographic images involving the children of the J Family.

It is the Government's burden to show that these children were the victims of sexual exploitation by Mr. Gadola, as the term is used in the plea agreement.  Neither the Presentence Report writer nor her supervisors assert that the children of the J Family are victims in this case or entitled to restitution.  (PSR:  Sentencing Recommendations.)[4]

### IV.    Mr. Gadola is committed to turning his life around, and has the social, medical and familial support necessary to be successful.

Mr. Gadola has clearly acknowledged that his behavior violated the law.  (Dkt. 100, PSR, PageID 737, ¶¶ 58-60.)  He acknowledges that his behavior may have caused confusion and harm to the victims.  (*Id.* ¶ 60.)  As set forth above, Mr. Gadola has frequently and repeatedly expressed his deep remorse for his actions to friends, family members, and members of his church.   (Ex. J, Ex. G, and Ex. A.) Mr. Gadola has wonderful relationships with his parents and with his sister.  (Dkt. 100, PSR, PageID 741, ¶¶ 101 and 106.)  He also has support from friends, his church, and his youth pastor.  (e.g., Ex. L.)  David Murley, a friend of Mr. Gadola, writes that after Mr.

---

[4] On this point the PSR is a bit confusing, as paragraph 175 has bolded text referring to $66,472.38 being "due and owing" to the J Family.  This is the Government's positon but not that of Mr. Gadola or the U.S. Probation Office.  Mr. Gadola agrees with the U.S. Probation Office that the J Family children are neither victims of the offense conduct, nor are they owed restitution.

Gadola's arrest, "I told his father to tell Sameer that he is my brother and that we (my wife and I) still love him." (Exhibit M, Letter from David Murley.)

Mr. Gadola fervently wants to improve himself after his past mistakes and avoid ever making similar mistakes in the future. He is committed to continuing his therapy with Dr. Meland, and Dr. Meland is similarly committed to addressing Mr. Gadola's issues: "I will continue to work actively with Sameer and his family to support his development and the development of appropriate coping and life skills including improved understanding and awareness of social appropriate behaviors and social norms." (Ex. A.)

## REQUEST FOR VARIANCE

Following the decision in *United States v. Booker*, 543 U.S. 220 (2005), and its progeny, the Sentencing Guidelines are treated as merely advisory, and a district court is directed to impose a sentence "sufficient, but not greater than necessary, to comply with the purposes" of the Sentencing Reform Act. 18 U.S.C. § 3553(a). The Act's purposes include reflecting the seriousness of the offense, promoting respect for the law, and providing just punishment, deterrence, and protection to the public. 18 U.S.C. § 3553(a)(2).

Despite the fact that none of the images that Mr. Gadola possessed were of prepubescent children, and not a single image could be characterized as a sexually suggestive child image, a sexually explicit pose, an explicit sexual act, or an image depicting violence, which typically result in federal prosecution, and despite the fact that Mr. Gadola never shared these images with a third party, Mr. Gadola's advisory guideline range is 188 to 235 months. We respectfully contend that such a guideline sentence (Level 36, Criminal History Category I) is far greater than necessary to achieve the purposes of 18 U.S.C. § 3553(a).

Moreover, based on the facts of this case, including the well-documented cognitive challenges of Mr. Gadola and the types of images that were exchanged, a sentence far below the advisory guideline range would be entirely adequate to deter this type of criminal conduct (for Mr. Gadola and others) and communicate to Mr. Gadola, and to the public, the seriousness of this offense.  Mr. Gadola has no history of violent criminal activity or coercive sexual conduct.  The sentence recommended by the PSR writer—188 months—is draconian in the context of Mr. Gadola's life, mental limitations, and criminal activity.  In the context of the acceptance Mr. Gadola has shown, such a sentence would clearly be far greater than necessary to achieve the goals of sentencing.

### 1.  This Is Not the Typical Child Pornography Case Prosecuted in Federal Court

In its "2012 Report to the Congress:  Federal Child Pornography Offenses," the Sentencing Commission reviewed "over 2,600 PSRs" regarding possession of child pornography cases and "[found] that the overwhelming majority of PSRs included reference to images depicting oral, vaginal, or anal penetration of a prepubescent child. The Commission further [found] that a substantial minority of PSRs included reference to images depicting sexual acts involving infants or toddlers."[5]   While we acknowledge that the instant offense involved more than the simple collection of child pornographic images through internet searches, the images themselves did not

---

[5] U.S. Sentencing Commission's "2012 Report to the Congress:  Federal Child Pornography Offenses, Chapter 4, page 85 [https://www.ussc.gov/research/congressional-reports/2012-report-congress-federal-child-pornography-offenses].  In addition to the PSRs reviewed, the Commission relied primarily on social science research and available judicial opinions, "because the presentence reports (PSRs) prepared in preparation for sentencing of federal child pornography offenders vary in the detail provided with respect to the content of the child pornography offender's collection. While some PSRs describe an offender's collection with great specificity (e.g., the victim's age, gender, and sexual activity depicted), others describe enough information only to satisfy specific sentencing enhancements in the guidelines." *Id* at 84.

depict any prepubescent children, sexually suggestive child images, sexually explicit poses, explicit sexual acts, or images depicting violence.

The exchange of genital photographs among young people, commonly referred to as "sexting," is prevalent in society today.   In a recent article for the Journal of the American Medical Association ("JAMA") Pediatrics by Dr. Elizabeth Englander, entitled "Sexting – Prevalence, Age, Sex and Outcomes," JAMA Pediatric researchers analyzed the results of 39 studies with a total of 110,380 participants, finding that the mean prevalence for sending sexts was 14.8% and the mean prevalence for receiving them was 27.4%.  The study further concluded that "older adolescents are more likely to sext; that the prevalence appears to be increasing over time; and that much more sexting occurs on mobile devices than computers."   (Exhibit N, JAMA Pediatric Article p. 1.) Indeed, the older the sample of youths studied the more participants engaged in sexting.  One study by B. Klettke et al. referenced in the article, estimated adolescent prevalence for sexting to be between 10% and 16%, but the mean prevalence for sexting among young adults at approximately 48% to 53%.  *Id*. The JAMA Pediatric article further found that the prevalence for sexting among college students was 27% in 2012 and 44% in 2015.  *Id*.  While this information does not justify Mr. Gadola's criminal conduct here because he was over the age of 18 at the time and he engaged in sexting with young men under the age of 18, it is more understandable in light of Dr. Kieliszewski's conclusion that Mr. Gadola's current cognitive development is equivalent to that of a preteen or early teen.  (Dkt. 36, Kieliszewski Eval., PageID 140.)

### 2.  State Courts Have Diversion Programs To Address The Criminal Conduct of Mr. Gadola.

Recognizing that sexting is a new and evolving behavior, state courts have developed programs in their Family Divisions to deal with this problem when the sexting is done between minors.  In Kent County, a Youthful Sex Offender Treatment Program ("YSOTP") has been

developed to address sexting and other sexually-related activities of young adults ages 17 to 24. The program, explained and outlined in Exhibit O (attached) has been approved by the elected Kent County Prosecuting Attorney, Christopher Becker, and is currently being reviewed by Chief 17th Circuit Court Judge Mark Trusock.  The proposed program, which covers broader and significantly more egregious sexual conduct than Mr. Gadola's, is patterned after the successful juvenile program administered for over five years by the Family Division of the 17th Circuit Court, and with the goal of significantly reducing the risk of re-offending through early intervention and treatment options rather than incarceration.

Even without the YSOTP initiative, if Mr. Gadola would have been prosecuted in state court, he would have been eligible for the Holmes Youthful Trainee Act  ("HYTA"), which is a statutory diversion program available for young adults less than 24 years of age when the crime was committed. MCL 762.11.  Indeed, while Mr. Gadola will be required to register as a sex offender for the next 15 years as a result of his guilty pleas in this court, had Mr. Gadola been prosecuted in state court instead, and had he received and successfully completed HYTA probation, he would not be required to register as a sex offender.

### 3.  Mr. Gadola is Immature, and not Dangerous or Evil.

A guideline sentence of 188 to 235 months in prison for a then 21-year old man who was sexting with pubescent boys ages 13 to 16 years old is disproportionate to the crime.  Mr. Gadola is not a dangerous or evil man.  He is a good son, a good brother, a good friend, and a valued member of his church community, who needs continued counseling and internet abstinence rather than jail.  His family and friends can attest, and have attested, to his remarkable personality, his incredible capacity for friendship, and his gentle and kind nature.  Although he has made mistakes in his life, Mr. Gadola has openly admitted these mistakes, taken responsibility for them, and wants

to forge ahead with the rest of his life.  And—though Mr. Gadola does not disclaim his responsibility for his actions—there should be no doubt in this Court's mind that Mr. Gadola is a man struggling with significant disabilities and reduced mental functioning, and one who would only be further damaged by a long custodial sentence.  As Dr. Roy Meland, a board-certified psychiatrist who has treated Mr. Gadola regularly for five years, writes:

> I am requesting consideration and support of Mr. Gadola and his committed engagement in outpatient therapy as opposed to incarceration for his crimes.  I do believe he has made progress as he continues to move towards an adult and mature understanding of his responsibilities. [ . . . ] I would raise concerns that incarceration would negatively impact any gains made to date and would abrupt, if not prevent, further progress.

(Ex. A.)  A significant custodial sentence is simply unnecessary in this case to punish Mr. Gadola. Accordingly, Defendant Sameer Paul Gadola respectfully requests that this Court sentence him significantly below the guidelines, and in lieu of an extended prison sentence, extend the period of supervised release with additional conditions like the successful completion of recognized treatment programs.

## CONCLUSION

Sameer Paul Gadola made terrible mistakes, and he is ready to pay the price for those mistakes.   However, Mr. Gadola and undersigned counsel believe that a sentence significantly below his guideline range is sufficient, but not greater than necessary, to achieve the goals of sentencing.

Dated: September 4, 2018

*/s/ Brian P. Lennon*
Brian P. Lennon (P47361)
Madelaine C. Lane (P71294)
Warner Norcross & Judd LLP
111 Lyon St. NW, Ste. 900
Grand Rapids, MI 49503
(616) 752-2000
blennon@wnj.com
mlane@wnj.com

Thomas W. Cranmer
David Danny O'Brien
Miller Canfield Paddock & Stone PLC
840 W Long Lake Rd., Ste. 200
Troy, MI 48098
(248) 267-3381
cranmer@millrecanfield.com
obrien@millercanfield.com

*Attorneys for Defendant Sameer Gadola*

17528869-2