```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE WESTERN DISTRICT OF MICHIGAN

 3                            SOUTHERN DIVISION

 4      UNITED STATES OF AMERICA,

 5            Plaintiff,                  No.  1:17cr80

 6        vs.

 7      SAMEER PAUL GADOLA,

 8            Defendant.

 9
        Before:
10
                           THE HONORABLE JANET NEFF,
11                           U.S. District Judge
                             Grand Rapids, Michigan
12                      Monday, September 10, 2018
                           Sentencing Proceedings
13
        APPEARANCES:
14
                      MR. ANDREW BIRGE, U.S. ATTORNEY
15                    By:  MS. ALEXIS SANFORD
                      MR. DANIEL MEKARU
16                    330 Ionia NW
                      Suite 300
17                    Grand Rapids, MI 49501
                      616-456-2404
18                                      On behalf of the Plaintiff;

19                    MR. BRIAN PATRICK LENNON
                      Warner Norcross & Judd
20                    111 Lyon Street N.W.
                      Suite 900
21                    Grand Rapids, MI 49503
                      616-752-2089
22
                      MR. THOMAS W. CRANMER
23                    Miller Canfield Paddock & Stone PLC
                      840 W Long Lake Rd., Ste. 200
24                    Troy, MI 48098
                      (248) 267-3381
25                                      On behalf of the Defendant.
```

1               September 10, 2018

2               PROCEEDINGS, 9:31 a.m.

3          THE CLERK:  All rise, please.  This court is now in

4     session.  Please be seated.

5          THE COURT:  Good morning, everybody.

6          MR. LENNON:  Good morning, Your Honor.

7          THE COURT:  I apologize for the late start.  It really

8     was my responsibility and I got caught up in some things.

9          This is the date and time set for sentencing in case

10    number 1:17cr80, the United States of America versus Sameer

11    Paul Gadola.

12         Counsel, may I please have appearances and any

13    introductions.

14         MS. SANFORD:  Good morning, Your Honor.

15    Alexis Sanford appearing for the United States.  Present with

16    me at counsel table is Assistant U.S. Attorney Dan Mekaru and

17    FBI Special Agent Hank Impola.

18         THE COURT:  Thank you.

19         MR. LENNON:  Good morning, Your Honor.  Brian Lennon,

20    Warner Norcross & Judd.

21         MR. CRANMER:  Your Honor, good morning.  Tom Cranmer

22    from the law firm of Miller Canfield Paddock and Stone on

23    behalf of Mr. Gadola.

24         MR. LENNON:  Seated between us, Your Honor.

25         THE COURT:  Thank you.  On March 30, 2018, Mr. Gadola

appeared before Magistrate Judge Ray Kent and entered a guilty

plea to all three counts of a superseding felony information.

The three counts to which the defendant pled guilty are

identical:  Counts 1, 2 and 3 all charge possession of child

pornography, and those counts are contrary to 18 U.S.C.

2252A(a)(5)(B), and 2252A(b)(2).  The maximum potential

penalties for those offenses are ten years imprisonment and a

$250,000 fine.

The offense behavior can be fairly summarized as

follows:  Using a Smart phone the defendant communicated with

three young boys ages 16, 14 and 13; in a series of text

messages he induced each of them to send images to him

depicting their genitals and erect penises over the Internet.

He admits in his plea agreement that these were lascivious

images.

The report and recommendation of the magistrate judge

was adopted on May 10, 2018.  I do accept the written plea

agreement in this case.  The charges pled to do reflect the

seriousness of Mr. Gadola's behavior.  I'm not entirely

convinced that they reflect all of it or all of the seriousness

of it.

In any event, the magistrate judge has indicated an

objection to paragraph 16 of the plea agreement, and I

essentially agree with his objection, although -- and his

objection is set out at page 20 of the plea transcript.  I

1     essentially agree with that objection to paragraph 16.  And I

2     realize the government has a different view of it.  But I'm not

3     going to order that it be stricken.  I just want the record to

4     reflect that I too think that a defendant cannot waive the

5     government's duty not to bring vexatious, frivolous claims

6     against a defendant or to act in bad faith.

7          There is a presentence report prepared by United

8     States Probation Officer Bonnie Mosley who is also in the

9     courtroom this morning.

10         Ms. Sanford, does the government have any issues with

11    regard to the factual recitation in the report?

12         MS. SANFORD:  We have no factual disputes with the

13    report, Your Honor.

14         THE COURT:  Thank you.  Mr. Lennon, how about on

15    behalf of the defendant?  Strictly with regard to the facts.

16         MR. LENNON:  No, Your Honor.  With regard to most of

17    the offense conduct.  We actually through all the factual basis

18    we do have a standing objection to any inclusion of the J.

19    family, specifically, in paragraphs 54 and 175 in the report.

20    Those have to go with some factual statements and an assertion

21    of restitution owed.

22         But other than the inclusion of information regarding

23    the J. family, there are no objections to the factual

24    recitation.

25         THE COURT:  Thank you.  Mr. Gadola, just a couple of

questions for you, sir.  Have you read the presentence report?

THE DEFENDANT:  Yes, I have, Your Honor.

THE COURT:  And have you discussed it carefully and thoroughly with your attorneys, Mr. Lennon and Mr. Cranmer?

THE DEFENDANT:  Yes, I have, Your Honor.

THE COURT:  As you sit here in the courtroom this morning, is there anything about the report that you either do not understand or about which you have any question at all?

THE DEFENDANT:  No, Your Honor, not that I can think of.

THE COURT:  Are you sure?

MR. LENNON:  May we have a moment, Your Honor?

THE COURT:  Certainly.

(Discussion off record in court)

THE DEFENDANT:  I can't, I can't think of any questions I have at this moment.

THE COURT:  Okay.  Fair enough.  Now, your counsel have been retained to represent you in this case.  Have you been satisfied with the work that they have done on your behalf?

THE DEFENDANT:  Yes, Your Honor, I have.

THE COURT:  Okay.  The presentence report includes a calculation of the guidelines and the advisory guidelines ranges as follows:  I will point out that the calculations for each of the three counts is identical, and as pointed out in or

1    set out in paragraph 12A of the plea agreement, the application

2    of sentencing guidelines 2.2 --   2G2.1 is stipulated to apply

3    here.  And that affects the calculation of the offense level.

4         So the offense level is calculated at 36, Criminal

5    History Category is calculated at 1 based on zero criminal

6    history points, and those two calculations place this case in

7    Zone D of the grid where the incarceration range is 188 to

8    235 months, although, as noted earlier, the maximum potential

9    custody sentence for these offenses is 120 months, but they can

10   be stacked to achieve an incarceration within the guidelines

11   range.

12        The supervised release range is five years to life,

13   the fine range is 40,000 to $250,000, restitution as pointed

14   out by Mr. Lennon and also discussed in the sentencing memos

15   and the presentence report, that is to be decided.  We are

16   going to talk about that a little bit later.  And there is a

17   mandatory special assessment of $100 per charge for a total of

18   $300.

19        Now, the restitution issue, Mr. Lennon, has been laid

20   out as a scoring issue but it really isn't.  But I think we

21   might as well discuss it at this juncture.  You can put your

22   argument on the record.  I'm sure Ms. Sanford has something to

23   offer as well, and I'll make that determination at this point

24   or at least I hope I can.

25        MR. LENNON:  Thank you, Your Honor.  From the victim

impact statements that were filed under seal I would point out,
Your Honor, that there was one from a counselor of the young
man identified as J.L. out of Texas.  No other submissions by
any of the individuals, juveniles who were identified as
exchanging genital photographs with Mr. Gadola.  And we would,
Your Honor, concede that any other children who had exchanged
genital photographs with Mr. Gadola would indeed be considered
victims under this case.  The bulk of the documents provided to
the Court under the seal are involving the J. family.  And,
Your Honor, it's our position, it's been our position, that
they are not victims of this crime.  I will --

     THE COURT:  Well, strictly speaking they are not
victims of the crime of conviction, but they --  well, I'll let
Ms. Sanford argue that.  The issue is a little broader than
that, I think.

     MR. LENNON:  Well, Your Honor, and I'll --  I do want
to address kind of the factual basis behind that because this
Court, as the Court well recalls, had two days of testimony
that culminated, if you will, in what is apparently the
purported admissions by Mr. Gadola.  Of course not on tape,
after nine hours of questioning, that led to even Special Agent
Impola contacting the ███████, sorry, I apologize, Your Honor,
the J. family.  I ask that be stricken from the record, Your
Honor, and I'll do my best to not do that again.

     But this, this alleged incident which the government

1     is now seeking restitution for is not, would not be considered

2     part of the offense conduct and was not included in the Court's

3     recitation of the offense conduct.

4          And what we frankly believe is the government is

5     trying to get in through the back door which they couldn't

6     through the front door.  The government has argued this would

7     be under the mandatory restitution statute.  That's not clear.

8     And they also argue that the plea agreement would encompass

9     this conduct.  Which we argue it does not.

10         THE COURT:  Well, let's make sure we are all on the

11    same page there.  Because we are talking about paragraph 5, I

12    believe, of the plea agreement.

13         MR. LENNON:  Yes, Your Honor.

14         THE COURT:  Which says, and I quote, "Mandatory

15    restitution" MRA, the statute you're talking about, "the

16    defendant understands that he will be required to pay full

17    restitution as required by law, see USC Sections 2259, 3663,

18    3663A.  The defendant also agrees to make full restitution to

19    all of the victims of his sexual exploitation of children

20    including but not limited to the children depicted in the

21    images charged in the superseding felony information, as well

22    as the children who appear on any other child pornographic

23    images produced, received, possessed or accessed by the

24    defendant.  The defendant agrees that the restitution order is

25    not restricted to the losses related to the counts to which he

1   is pleading guilty.  The parties currently do not know the

2   applicable amount of restitution and agree that the amount will

3   be determined by the Court at sentencing."

4           MR. LENNON:  Yes, Your Honor.  And so our point is

5   this plea agreement which was provided to us and was

6   nonnegotiable, in fact on March 27, 2018, when we asked to

7   engage in some tweaking of language we were told that it would

8   remain as is.  On March 29th, 2018, the government was aware of

9   the J. family for over a year and did not explicitly put this

10  in there.  So I would argue there was no meeting of the minds

11  with respect to the J. family.  If they expected the J. family

12  to come under this, they had 14 months that that could have

13  been discussed.

14          Our interpretation of this, which we believe is

15  consistent with the mandatory restitution statute was we knew

16  they had lots of other images, 20, 30 other images depicting

17  genitalia of young men.  If they had identified any of those

18  others, and indeed they apparently have, those people would be

19  victims; those people could be entitled to restitution.  But

20  not the J. family.  And we believe any, any question about the

21  drafting of this on a nonnegotiable plea agreement has to go

22  against the government.  If they intended the J. family to be

23  part of this restitution, they should have put it in there.

24          THE COURT:  Well, I'm sure Ms. Sanford has a contrary

25  argument to make.  So let's hear what that is.

1          MR. LENNON:  Thank you, Your Honor.

2          MS. SANFORD:  Your Honor, my drafting of the paragraph

3     5 that the Court just read into the record was intended to cast

4     a wide net so that it wasn't just the three boys and the counts

5     of conviction that would be entitled to seek restitution

6     claims.  As laid out in our sentencing memorandum, we do think

7     that the J. family are victims of Gadola's sexual exploitation

8     of children.  And I do believe that there's a sufficient

9     factual basis for that laid out in the presentence report.  We

10    provided the probation officer who prepared the report, Officer

11    Mosley, and the defense with copies of the reports and the

12    recordings from the Child Advocacy Centers where these children

13    were interviewed.  I think given the disclosures that they made

14    at the time of the interviews, as well as Gadola's admissions

15    about his conduct toward these children, it is appropriate to

16    include them in the restitution calculus.

17          I would also note that if the Court wanted to hear

18    testimony, although I don't believe that it's necessary, the

19    mother of the children is present today to address that the

20    family had no advance knowledge of the allegations before their

21    interviews.  However, she also outlined that in her victim

22    impact statement.

23          So I do think there is a sufficient basis here on the

24    record for the Court to find that these children were victims

25    of his exploitation, that this family has suffered economic

1    damages because of that exploitation, and that they are

2    entitled to restitution.

3         THE COURT:  Thank you, Ms. Sanford.  Well, let's first

4    of all dispense with the idea that the fact that this plea

5    agreement was submitted to the defendants without the

6    opportunity to negotiate.  Let me first say that the defendant

7    and his counsel didn't have to accept it and sign it.

8    Secondly, this plea agreement provided defendant and does

9    provide the defendant with tremendous benefit.  The counts

10   which were dismissed here for which the factual recitation in

11   the plea agreement and throughout this file suggest offenses

12   that would have carried potentially a mandatory minimum

13   15 years imprisonment.  So I have no real empathy with

14   counsel's concern about this not being a negotiated settlement.

15   Nor do I have any real, place any real credibility in the

16   argument that this is not how they interpret the paragraph 5;

17   which Ms. Sanford I think did cast a very broad net.  It is not

18   limited to in any way, as far as I can tell based on the clear

19   language of the paragraph, it's not limited to victims who were

20   known at the time counsel and the defendant entered into the

21   plea agreement, and it covers in my view all of the J. family

22   victims when it says that, "The restitution order is not

23   restricted to the losses related to the counts to which he is

24   pleading guilty."

25        So the objection to restitution on behalf of the J.

1    family is respectfully denied.

2            The only question I have for the government really has

3    to do with the calculation.  And I'm not certain that all of

4    the items included in the claim for restitution on their behalf

5    are proper.

6            So I would like to hear Ms. Sanford's view on that,

7    please.

8            MS. SANFORD:  Respectfully, Your Honor, is there

9    something in particular that you would like me to address?

10            THE COURT:  Well, I'm just looking.  I'm not putting

11    my hands on it right off the bat.  There was a, if I recall

12    correctly, there was an attorney fee issue.  I'm not entirely

13    convinced that all of the counseling fees are recoverable.  I

14    was trying to find that.  I know that there is a --

15            Ms. Mosley, do you know where that is set out that

16    there's a chart I thought.  105.  Is that in the impact

17    statements?

18            THE CLERK:  Yes.

19            THE COURT:  Okay.  Thank you.  The wage loss on behalf

20    of the parents.  There were apparently some insurance benefits

21    were paid, there were -- the J. family received state crime

22    victim compensation benefits.  And so, you know, I'm just not

23    certain of the inclusion of various items.  And I would like

24    for you to talk to me about attorney fees as well.  Where you

25    find that in the statute and in the guidelines.  If at all.

1    MS. SANFORD:  Let me start, first of all, the Court

2    mentioned lost wages.  I don't believe that there is a request

3    for any wages.  I'm looking at page ID 771 which is the

4    financial impact statement and verification of financial loss.

5    Question 7 asks the family, "Were you unable to work or did you

6    miss work as a result of this crime?"  And they indicate that

7    there was no wage loss although there was missed work due to

8    attending driving to numerous medical and counseling

9    appointments for family members, meetings with the FBI,

10   attending court, et cetera.  So I don't believe that there is

11   any claim for lost wages.  I think they are just indicating

12   that there was missed work because of this case but I don't see

13   anywhere where they delineate an amount of money that they are

14   seeking for wages.

15        Regarding the funds that they received from the Crime

16   Victims Fund from the State of Michigan, if a restitution order

17   is entered in this matter, the J. family will be responsible

18   for repaying the Michigan Crime Victims Fund the money that

19   they have already been forwarded to offset their bills.

20        THE COURT:  What about the amounts they might have

21   recovered from their insurance?

22        MS. SANFORD:  I don't believe that they are seeking

23   the amounts they didn't recover from their insurance.  Looking

24   at page ID 773, they indicate, "That to prepare this statement,

25   we logged into their insurance website and reviewed all archive

1    copies of their explanation of benefits forms.  They show the

2    amounts that we are responsible for which are not covered by

3    insurance.  Even after the annual deductible is exhausted,

4    there is still a copayment, then the deductible resets back to

5    zero on January 1."  So I believe the request here is for their

6    out of pocket insurance.  In fact, you'll see that for one of

7    the children, J.G., they are asking for the full amount because

8    in that particular instance their insurance provider doesn't

9    cover her treatment.

10            And I'm happy to call a witness to answer some of

11   these questions if the Court would find that helpful.

12            THE COURT:  I think I would.

13            MS. SANFORD:  Yes.  One moment, please, Your Honor.

14   Your Honor, I'm going to call at this time ███████████ and I

15   would request that his name actually be redacted from the

16   transcript so the identity of the family isn't publicized.

17            THE COURT:  Very well.

18            GOVERNMENT WITNESS, WAS DULY SWORN

19            THE CLERK:  Thank you.  Please be seated.

20                      DIRECT EXAMINATION

21   BY MS. SANFORD:

22   Q    You are the father of the children that we have been

23   discussing?

24   A    Yes.

25   Q    And you prepared this restitution request?

1   A    I did.

2   Q    All right.  Let's start by talking about what is and is not

3   covered by your insurance.  Did you submit any claims for any

4   payments that your insurance made to any providers?

5   A    No.

6   Q    So the amounts that you've indicated on these forms that

7   you completed are your out of pocket expenses?

8   A    Yes.

9   Q    After insurance has covered whatever their portion is?

10  A    Correct.

11  Q    Also, was I correct, are you going to be required to

12  reimburse the Crime Victims Rights Fund for the State of

13  Michigan?

14  A    That is our understanding of how it works, yes.

15  Q    Okay.  And then you indicated that there was some out of

16  pocket expense to consult with your family attorney.

17  A    We did.  We asked for advice.

18  Q    Advice regarding just generally --

19  A    The court process and what to expect and kind of how this

20  works.

21  Q    Okay.  And was that a one-time consultation?

22  A    Yes, it was.

23  Q    All right.  That was just sort of what to expect when

24  dealing with a criminal process?

25  A    Correct.

1    Q    That was $405 amount that you paid?

2    A    Yes.

3    Q    This was a family attorney that you had retained for other

4    matters at a different point?

5    A    It's our family attorney for other things.

6    Q    You have also submitted requests for repayment for

7    prescription medication costs?

8    A    Correct.

9    Q    Is that for out of pocket expenses only?

10   A    Yes.

11   Q    And then you calculate that your children will remain in

12   counseling for sometime.

13   A    Yes.

14   Q    And how much counseling will cost until they turn 18 for

15   you out of pocket, is that correct?

16   A    That is correct.

17   Q    And so you listed that as future calculation of counseling

18   expenses.

19   A    Yes.

20   Q    That's for each of your children until they turn 18 and

21   then for you and your wife?

22   A    Yes.

23   Q    Until what point?

24   A    Until the children are 18.

25        MS. SANFORD:   I have no further questions.

THE COURT:  Mr. Lennon.

MR. LENNON:  Thank you.

CROSS-EXAMINATION

BY MR. LENNON:

Q    Good morning, sir.

A    Good morning.

Q    Did you submit to the victim witness unit here any documents to support these calculations?

A    Yes.

Q    So you did give them both receipts and diagnosis, is that correct?  What did you give them?

A    Bills and things that we had at home.  I know I went to the pharmacy to get the prescription records.

Q    And so all of that that you had in your possession was provided to the government?

A    We provided -- I think I provided the log-in information or I provided the Aetna stuff.  I had to go into the computer and look at all those benefit statements.

Q    And all of those figures support these numbers in here, at least of current and present costs?

A    Right.

Q    Let's talk about the future costs here, future calculations.  Do you have plans of care by the physicians who have seen B. and S. and C. and you and your wife saying that they will need counseling until they're 18 years of age?

A    No.

Q    So these future costs of 52,704, that's just your

calculation of current expenses if you need, everyone needs

counseling for the next almost decade, is that correct?

A    Yes.

Q    Now, I saw someone -- and first of all, I know you're

friends with the Gadola family; they feel very badly that you

are in this position here today.  But let me tell you.  Let me

ask you.  As of the date that Mr. Impola came to your home, you

had no concerns about Sameer Gadola, did you?

A    No, actually we did have some concern before that because

of social media.

Q    Did you talk to the Gadolas about that?

A    No, we did not.

Q    And in fact you even went to their home and spent holidays

with them, correct?

            THE COURT:  Are we talking about restitution here,

Mr. Lennon?

            MR. LENNON:  We are, Your Honor.  But I think the

Court wants me to focus on the numbers only.  And I will do

that.  The future costs, I'm assuming that you've also included

for you and your wife, is that correct?

            THE WITNESS:  Correct.

BY MR. LENNON:

Q    And you said that you have no doctor's notes or diagnosis

1    plans of care saying you're going to need extended care in this

2    matter, is that correct?

3    A    We are still under treatment with the providers.

4    Q    Understand that.  But I'm talking about the length of time

5    in which you need to go into, have these services for you and

6    your children.  You have nothing to establish that you will

7    need these services as long as it's provided for the dates

8    estimated in here, is that correct?

9    A    Yes.

10              MR. LENNON:  Thank you.  May I have a moment, Your

11   Honor?  Thank you, Your Honor.

12              THE COURT:  Your children are still in counseling.

13              THE WITNESS:  Yes.

14              THE COURT:  On a regular basis?

15              THE WITNESS:  Well, due to the expense they are not

16   going as frequently as they were, but we would like to be able

17   to resume that.

18              THE COURT:  Okay.  Anything further, Ms. Sanford?

19              MS. SANFORD:  Not for this witness, thank you.

20              THE COURT:  You may step down.  Thank you for your

21   testimony, sir.

22              I have some real reservations then about two areas:

23   First of all, the attorney fees which I don't think, at least I

24   haven't seen any authority for that.  And for the counseling

25   fees for the parents.  I think that the counseling fees for the

children past, present and future are certainly proper, but I
would like to see a recalculated bottom line that does not
include those two items.

    MS. SANFORD:  If I may, Your Honor.

    THE COURT:  I'm sorry?

    MS. SANFORD:  My request would be, we can delay
restitution findings for 90 days under 18 U.S.C.
Section 3664(d)(5).

    THE COURT:  Right.

    MS. SANFORD:  I would like the opportunity to submit
the recalculated numbers the Court has requested.  And if the
parents can obtain something in support of their claim from
their doctors, I would also like the opportunity to submit that
to the Court for its consideration.

    THE COURT:  I don't -- don't get me wrong.  I do not
--  I do not contest their need.  What I do contest is their
entitlement.  And what I would really like to see from the
government, and of course the defense will have the opportunity
to respond, but what I would really like to see is some
authority for extending restitution beyond the actual victims
of the crime for the behavior.  So that's what I'm really
looking for.  I don't, I don't -- I mean if they -- obviously
if there are some justifications, medical justifications for
their need, that's fine.  That should be included also.  But my
real concern is whether the law permits that kind of

1   restitution.  Okay?

2           MS. SANFORD:  Yes.  May I submit something to the

3   Court?

4           THE COURT:  Yes.

5           MS. SANFORD:  30 days?

6           THE COURT:  That's fine.  And Mr. Lennon, the defense

7   will have 28 days to respond.

8           MR. LENNON:  Thank you.  And, Your Honor, with that, I

9   don't believe we have any of the supporting documentation for

10  any of the numbers or any of the diagnoses.  But I will

11  certainly work with, if we missed them we will work with

12  Ms. Sanford to be able to review those and obviously keep that

13  confidential.  But we would like that opportunity to respond.

14          THE COURT:  Thank you.  Okay.  So that now we are past

15  the objections, which, as I said, did not really affect in any

16  way the scoring, my calculation of the scoring is the same as

17  the probation officer's:  Offense level 36, Criminal History

18  Category I, an advisory guidelines range of 188 to 235 months,

19  a range for supervised release of five years to life, a fine

20  range of 40,000 to $250,000, and a $300 mandatory special

21  assessment.

22          Does the government agree with the accuracy of those

23  calculations, Ms. Sanford?

24          MS. SANFORD:  I do, Your Honor.  I would also just

25  remind the Court that there is the additional special

1   assessment.

2          THE COURT:  Thank you.  I forgot that.  Yes.  The

3   $5,000 per count Justice for Victims of Trafficking Act of 2015

4   which is also a special assessment.  And that amounts to a

5   total of $15,000 in addition to the $300 special assessment.

6   Thank you for reminding me.  That's the second reminder I have

7   had this morning.  Goes to show you it's Monday morning.

8          Mr. Lennon, are you in agreement with the accuracy of

9   the calculations?

10         MR. LENNON:  Yes, Your Honor.

11         THE COURT:  Thank you.  Mr. Lennon, are you ready for

12  your allocution?

13         MR. LENNON:  I am, Your Honor.  We would like to start

14  with the Court's indulgence with respect to calling two experts

15  to address a number of areas.  And this goes to our motion for

16  a variance and for the Court's ability to fashion a sentence

17  that is sufficient but not greater than necessary to achieve

18  the purposes of sentencing.

19         The first would be Ron Grooters who, among other

20  things, has done the ABLE assessment which the Court has

21  ordered as part of its supervised release conditions, as well

22  as the Look test.  A copy of that report was provided under

23  seal as Exhibit H to our sentencing memorandum.  He will, can

24  opine and give the Court some indication of his evaluation and

25  opinion of risk for Mr. Gadola, the likelihood to reoffend, and

the extent if any of any sexual deviance.

The second witness, Your Honor, would be Randy Flood who is, works with men like Mr. Gadola in various out patient programs.  Can also explain the YSOTP program that is available in Kent County, and would be available at a cost to Mr. Gadola as either, as in this case, a condition of supervised release, and what we would argue would be a reason why the Court should depart significantly from the guidelines, increase supervised release, and allow Mr. Gadola to participate in this program or any other programs the Court would deem acceptable.  We would like the opportunity to call those two witnesses prior to our allocution.

THE COURT:  Does the government have any comment on that, Ms. Sanford?

MS. SANFORD:  Your Honor, regarding Mr. Grooters, the Court has his report.  I'm not certain what additional information would be provided that would be helpful to the Court regarding the assessment that he performed.

I have no information about the other proposed witness.  I'm skeptical of the helpfulness of information about a county court program to this Court's assessment of a federal sentence for Mr. Gadola.  But I would leave that to Your Honor's discretion.

THE COURT:  Well, I share your skepticism with regard to the Kent County program, Ms. Sanford.  I did read all of the

1    submission with regard to that, and I don't --  I'm not really

2    sure that it is something that would be helpful to me in

3    determining a sentence which is sufficient but not greater than

4    necessary.  And I say that partly because the, the submission

5    on that, I don't know which attachment that was to the defense

6    sentencing memo, but the very first paragraph of the program,

7    the Youthful Sex Offender Treatment Program which is available

8    in Kent County says that, "Research has established that early

9    intervention with sex specific treatment can significantly

10   reduce the risk of reoffending."  I point out that Mr. Gadola

11   has had early intervention on any number of matters that he

12   struggles with, and it certainly didn't seem to affect this

13   process.

14         But in addition to that, I agree with Ms. Sanford, I

15   really do not see how it is going to be of any particular

16   benefit to me in reaching a sentencing decision.  Again, as I

17   said, I read the information that came with the brief and I

18   didn't find it particularly appropriate.

19         And then with regard to Mr. Grooters, I would say

20   this.  I found his report to lack credibility in a significant

21   number of particulars where, for instance, he concludes in two

22   places that Mr. Gadola is a typical adult heterosexual male, a

23   relatively well adjusted adult heterosexual male.  Those two

24   conclusions run pretty contra to two things:  They run contra

25   to the conclusions made by the Bureau of Prisons assessment of

1     Mr. Gadola, but even more importantly, they run contrary to the

2     defense in this case which has argued that Mr. Gadola, if I

3     understand their argument correctly, is not a typical adult

4     heterosexual male in almost any instance.  Nor is he a

5     relatively well adjusted adult heterosexual male.  The argument

6     has been that he has significant deficits, emotional,

7     cognitive, behavioral, that he has some confusion about his

8     sexuality, and finally, and those are only two of a number of

9     real questions I have about this report, but finally, he

10    concludes that there's no indication that Mr. Gadola has

11    progressed to any hands on offensive behavior towards children,

12    which we know is not true.

13          He had an encounter with his cousin who was younger

14    than he which did involve hands on offensive behavior.  And we

15    have the victim impact statements from the J. family which also

16    strongly support hands on.  So we know that there was I think

17    pretty clearly a lack of candor, if nothing more, when

18    Mr. Gadola was analyzed by Mr. Grooters.

19          He told Mr. Grooters he was not accused and had never

20    sexually abused a child.  He was accused of that and through

21    the good efforts of his counsel has avoided prosecution on

22    those more serious crimes.

23          So, you know, you can put Mr. Grooters on.  I really

24    do not think it's going to help me at all, Mr. Lennon.

25          MR. LENNON:  Your Honor, I understand the Court's

1   ruling.  And I just with the Court's indulgence would like to

2   just make a brief offer of proof with respect to that.

3         I think Mr. Grooters would explain that when he was

4   referring to kind of normal sexual, a normal adult male, he is

5   talking about kind of the sexual interest and not all of the --

6   he did not do the evaluations of Dr. Jeff.

7         THE COURT:  None of that is believable either,

8   Mr. Lennon, because all you have to do is read the transcripts

9   of Mr. Gadola's texting with these young boys that he was

10  enticing.

11        MR. LENNON:  Yes, Your Honor.  And I think, again,

12  with respect to an offer of proof, both Mr. Grooters and

13  Mr. Flood would be able to talk about the way the Internet of

14  things has essentially allowed for a new group of offenders.

15        Finally, Your Honor, the last point is as the Court

16  knows, and we contest the admissions that were, that are

17  attributed to Mr. Gadola with respect to when they were made,

18  they're the only ones that aren't recorded, and this really led

19  to the FBI contacting the ██████████ and what not.

20        But we are not -- I'm not here to reargue whether they

21  are victims.  The Court knows we are objecting to that.  The

22  Court was very clear.  We would simply ask the Court to

23  consider all of the evaluations by Dr. Kieliszewski,

24  Dr. van der Walt of the BOP, and Mr. Grooters, and I will

25  certainly proffer with respect to Mr. Flood's assessment and

1    what he could possibly do in the course of my allocution.

2          THE COURT:  Well, I'm glad you brought up the issue

3    of -- see what phrase you used.  "The way the Internet of

4    things allowing for a new group of offenders."  Because I did

5    spend sometime reading the editorial you provided as well

6    called, "Sexting:  Prevalence, Age, Sex and Outcomes."  Which

7    is also, for purposes of the defense in this case, a double

8    edged sword at the very least.  And one of the points made in

9    that editorial which appears in the Journal of the American

10   Medical Association Pediatrics, published in February of 2018,

11   is that there isn't even a uniform definition of this idea of

12   sexting.  I mean it's an area that has not had a great deal of

13   research to it, and I don't, I don't believe that it provides

14   any real comfort to the defense in this case.

15          MR. LENNON:  Your Honor, again, and I understand.

16   It's hard as a father to understand why young people would

17   engage in this behavior.  That article was provided to the

18   Court because it is an emerging area.  There are lots of

19   studies, in this case over a hundred thousand participants in

20   these 39 studies.  And --

21          THE COURT:  Without any real hard and fast

22   conclusions, Mr. Lennon.

23          MR. LENNON:  Well, but I think it takes, one part is

24   it takes -- that is true.  But other than the prevalence and it

25   appears to be becoming even more prevalent.  And the point

being that, yes, there is an element of the sentencing factors
that require deterring other people, and deterring Mr. Gadola,
but at the end of the day, counseling, more maturation through
these programs like the YSOTP program, which, by the way, Your
Honor, also includes individuals accused of contact offenses.
In state court they are allowed to participate in this program,
and the findings have been these long Draconian sentences
aren't the ticket to both improve Mr. Gadola's chances to
remain law abiding and also to protect the community. Because
the programs have shown great success in reducing the
likelihood to reoffend. But in sexting it takes apparently a
different form. Sometimes it's just messages. Arguably both
messages and photographs were submitted here. And, Your Honor,
we are not walking away from this language. This was Sameer's
language. But with the Internet of things people take on
different personas. People are able to explore in a relatively
safe way, now, again, this would be if we are talking
consenting adults in communication, this is clearly a violation
of law because of the age of these young men, and we understand
that they are victims and we are not backing away --

       THE COURT: I'm not even sure I would call them young
men. They were boys.

       MR. LENNON: Yes, Your Honor. 13 to 16. And we
understand the impact and we also understand that while they
may have been, they may not have wanted to submit victim impact

1    statements in this case because, you know, of the embarrassment

2    of being engaged in this.

3              But let me get back to my client because that's who I

4    know, that's who I have spent this time with.

5              He has always been from the very beginning very

6    remorseful and very sympathetic to the families, the children,

7    and the families for whom were dragged into this because of his

8    conduct.  You saw that in the letter.  You saw that in his

9    apology note that he wrote the day, at the end of his nine-hour

10   interrogation.  And you saw it in the letters of the people who

11   he has spoken with.  Hopefully, in your, the letter to you, you

12   also saw his deep remorse.  And I'll tell the Court, Your

13   Honor, I'll highlight the Court -- I know the Court is going to

14   ask him whether he wants to speak today -- he has been

15   practicing reading his letter in the mirror for several weeks

16   now.  And in fact last night practiced in front of his

17   kindergarten teacher and another family friend who stopped by

18   to provide support.  He just can't do it emotionally.  He can't

19   get through it.  But he has at all times shown remorse.

20             And again what I think Randy Flood would testify to is

21   they have young men like Sameer, young men engaged not only in

22   this conduct but also contact offenses who they have shown are

23   less likely to reoffend and more likely to mature in their

24   programs as opposed to long jail sentences.

25             I mean I know this is not state court, Your Honor.

1    Clearly.  Just as if we were here arguing on a drug for a drug

2    defendant.  We are not in state court.  But in state court, a

3    young man like Sameer would not only be entitled in Kent County

4    to access to the YSOTP program but also to the Holmes Youthful

5    Trainee program which would not -- he wouldn't even be required

6    to register as a sex offender.

7         THE COURT:  Highly doubtful that any circuit judge in

8    Kent County would afford him a Holmes Youthful Trainee

9    designation in a case like this where there has been acting

10   out, Mr. Lennon.

11        MR. LENNON:  Well, Your Honor, I would beg to differ

12   only because I have had cases involving sexual intercourse with

13   minors where they have received Holmes Youthful Trainee in Kent

14   County.  And that's because they have now -- a lot has happened

15   with the science of this, and that the long prison terms aren't

16   as helpful as the programs.

17        I can -- I have at least one defendant on the top of

18   my head I can tell right now, and I think Mr. Flood would

19   testify that that is, you know, we can't predict what judge we

20   have and what the judge would do, but Holmes Youthful Trainee

21   has been used for young adults Sameer's age for much more

22   severe contact offenses than what has even been alleged here.

23        THE COURT:  Well, I'm not going to argue apples and

24   oranges with you with regard to whether those cases are

25   distinguishable from this one on its facts.  I can think of

circumstances where a minor, 16 or 17 years old engages in this
kind of behavior and can be seen to be believed to be older
than that and so forth.  But this is a case that is not in my
view cognizable under Holmes Youthful Trainee.  Not where you
have this kind of enticement of young boys, and the kinds of
exchange of information and language that we see in this case.
Go ahead with your --

MR. LENNON:  Yes, Your Honor.  We will, and if the
Court, if the Court was indeed correct, we would then be
looking at guidelines of 2 months to 17 months and a maximum of
four years.  And that's scoring, my scoring including multiple
acts of penetration.  We would be looking at a two to four --
sorry, 2 to 17 on the low end, four on the statutory max.  In
this case Mr. Gadola is facing almost 16 years at the minimum
here.  We contend that that is far greater than necessary to
address the factors and the considerations the Court must
address in fashioning a sentence that is sufficient but not
greater than necessary.

Your Honor, I would also want to point out that we
have a young man who made some really terrible mistakes, and
he's acknowledged the hurt that he has caused to other people.
But in this case there are resources, there are resources that
have shown a great likelihood of success, and including what is
available to the Court here and was suggested or, sorry, was
mandated in the supervised release petition, no access to the

1    computer.  Mr. Gadola has been without access to the computer

2    and on home detention for 20 months.  So other than roughly

3    60 days when he reported and then went to a BOP facility in

4    Colorado, it's been now 20 months that he's been on home

5    detention, and there has been no offense.  The Court's own

6    condition of supervised release, and the Court has up to life

7    on supervised release, mandates and requires that he not have

8    access to a computer.  The fact that he has been on home

9    detention for 20 months, there's been no contact with victims,

10   there's been no contact with any children, should give the

11   Court comfort that a lengthy prison sentence is not most

12   appropriate in this case and that there are conditions outside

13   of a lengthy prison term that could ensure the safety of all

14   individuals.

15            And, Your Honor, may I have one moment?

16            THE COURT:  Sure.

17            MR. LENNON:  Thank you, Your Honor.

18            THE COURT:  Thank you, Mr. Lennon.  Mr. Gadola, at

19   this point you have the right to speak in your own behalf, to

20   tell me anything you think I should know about you, about what

21   you're charged with, what you've pled guilty to, and if you do

22   wish to speak, you may come to the podium with Mr. Lennon and

23   I'll hear what you have to say.

24            THE DEFENDANT:  No, Your Honor, not at this moment.

25   What I said in my letter I'm really remorseful for what I've

1        done online.  And that's all I got to say.

2             THE COURT:  Thank you.  Ms. Sanford.

3             MS. SANFORD:  Thank you.  Mr. Lennon spent sometime

4        talking about what would happen in this case if we were in

5        state court, but we aren't in state court.  This is a federal

6        case and I do think it should be compared to other federal

7        cases.

8             I have heard this Court's concerns in the past about

9        the child pornography guidelines and how they often overstate

10       the nature of the case.  But as is clear already from some of

11       Your Honor's comments, you recognize that this is not simply a

12       child pornography pictures case.

13            The defendant's sentencing memo began by discussing

14       the images at issue and how relatively tame they were.  There's

15       no rape or sadism, there weren't very many images that

16       Mr. Gadola possessed, the children were pubescent, but what the

17       defense sentencing memo neglected to address is the relevant

18       conduct of what this Court is clearly aware.

19            Sameer Gadola did not merely possess a handful of

20       photographs of pubescent boys.  Sameer Gadola reached out to

21       many children online grooming them with offers of athletic

22       training, asking for pictures of them in their boxers so he

23       knew what he was working with, or offering them help with

24       bullying, or offering them fun times at MSU events or going out

25       to eat.  And Sameer Gadola was an adult man preying on

children.  Some of whom knew enough to rebuff him telling him they were only in 8th grade and didn't want to go to a fraternity party, or they were too old to sit in his lap.  Some of the children didn't seem to understand the innuendos or implications of what Mr. Gadola was asking, and other children who as we see from the outcome of this case, did exactly what he asked, engaged in sexual conversations with him, and sent him nude pictures.

I very specifically included the conversations that Gadola had with these children in the plea agreement and in the sentencing memorandum because I think the language he uses belies some of the claims about his mental development.

There's a claim from Dr. Kieliszewski that he does not have the ability to think of and implement solutions to problems, but I think that's countered by his immediate and clever responses to any resistance from the victims in this case.  He told one boy who said he was not comfortable sending pictures that he better get comfortable because girls were going to want such things.  He told the children he wouldn't judge them, that it wasn't gay, that they would just compare, that he was trying to help them.

He seemed very capable of thinking of solutions and work arounds when these boys did not want to send him pictures.

We also see that he is capable of lying about himself to suit his ends, telling one of the boys that he's in 11th

1      grade.

2              I would also note that everything in the defense

3      member regarding Mr. Gadola's mental health neglects to

4      mention, completely ignores the findings of the psychologist at

5      the Bureau of Prisons as is outlined in paragraphs 123 through

6      125 of the presentence report.

7              And that's the doctor who spent the most time and did

8      the most testing with Mr. Gadola.

9              And I think also when we talk about Mr. Gadola's

10     behavior and his relevant conduct, it's important to remember

11     we are talking about more than just online predation.  He also

12     exploited any in-person contact he had with children as well,

13     engaged in oral sex and masturbation with his teenage relative,

14     he admitted fondling the youngest J. child while tickling and

15     wrestling with the boy; the older J. child describes the ways

16     that Gadola would rub and touch him as well.

17             And so I think that the fact that he now denies in his

18     written statement to the Court at page ID 839 that he ever

19     touched anyone is countered by all the facts that the Court has

20     in this case.

21             The idea that the Court does not need to be concerned

22     about protecting the public from Mr. Gadola is laughable when

23     the offender standing before you has exploited almost any child

24     with whom he had contact.

25             And such claim is particularly dubious when I refer to

1    paragraph 60 of the presentence report where Mr. Gadola

2    admitted to the probation officer that he is experimenting with

3    his sexuality, that he is not attracted to males his own age,

4    and that he cannot control his sexual urges but will be more

5    cautious.

6        Someone who admits he is incapable of controlling

7    himself is exactly whom the public needs to be protected from.

8        Given this plea agreement the Court has the ability to

9    impose up to 30 years imprisonment which is the combined

10   statutory maximums, and I believe given the nature and

11   magnitude of his conduct, to deter such future behavior, and

12   protect the public, a sentence within the advisory guidelines

13   is appropriate.  Thank you.

14        THE COURT:  Thank you, Ms. Sanford.  Well, the

15   guidelines which are presented here are, as in most cases

16   anyway where there aren't mandatory minimums, they are advisory

17   but I do have to consult them and consider them before reaching

18   a sentencing decision which is reflective of my underlying duty

19   to impose a sentence which is sufficient but not greater than

20   necessary to comply with the purposes of Section 3553(a).

21        And the sentencing calculus starts, as many legal

22   constructs do, with an attempt to balance, balance here the

23   offense and the offender.  The seriousness of this offense

24   cannot be understated, which defense counsel tries mightily to

25   do.  And considering, as the plea agreement says I can, or may,

1    all of the behavior in this case, this case is very, very

2    serious.  I think Ms. Sanford put her finger on it in her

3    allocution.

4         And then we balance that against the defendant.

5    Mr. Gadola is 23 years old.  He's a young man.  He's, he had a

6    tough start in life, no question about that, and his, as his

7    submissions have argued, his physical and emotional development

8    have been somewhat delayed, but he's also had the benefit of

9    significant assistance in many areas where he has needed help

10   from the time he was very, very young.

11        He has had the benefit of resources that very, very

12   few children have in their development.  He's a high school

13   graduate but he wasn't successful at the next level of his

14   education.  He seems to have had a relatively free rein with

15   regard to use of technology, and that is where he really got

16   himself into serious, serious trouble.

17        Now, going further to the purposes of sentencing under

18   the statute.  I think it would be difficult to find any part of

19   it that didn't apply.  There has to be some punishment for this

20   kind of behavior.

21        There has to be --  Mr. Gadola from the texting that

22   he did clearly indicated that he knew what he was doing was

23   wrong, and I think he probably knew it was illegal as well.

24   And so respect for the law is important here.

25        Deterrence is important.  I simply do not believe that

1    the totality of this file suggests that Mr. Gadola is not a

2    danger.  And so deterrence is important.

3            But the most important duty that I have in this case

4    is to protect the public from further crimes of the defendant,

5    which I think pretty clearly are potential.

6            We also need to provide with him medical, educational

7    and correctional treatment.

8            There is an issue with regard to unwarranted

9    disparities, and Ms. Sanford pointed out that I have, and I do,

10   have some serious questions about the guidelines in child

11   pornography cases.  In fact, I put on the record about five

12   years ago a fairly lengthy argument or explanation for my

13   policy.  These guidelines are harsh.  But at that time in that

14   case, and in cases since then, I have pointed out that my

15   policy has a demarcation in it.  Where there is, and there

16   often are in child pornography cases, there often are

17   defendants who exhibit no indication of acting out on these

18   fairly awful offenses that the guidelines don't take into

19   account, and the guidelines just are off the charts.  But the

20   line is crossed in my view and in my policy where there is

21   indication that there has been acting out and that there is

22   danger of further acting out, which I think is very clear in

23   this case.

24           Are the guidelines here appropriate?  Do they reflect

25   the statutory factors?  I will have to acknowledge that this is

a difficult case, and balancing the factors, and further
recognizing that there's no presumption that the advisory
guidelines range is correct, the sentence in this case is a
result of my own independent review of the sentencing factors
and the entire sentencing file.

The plea agreement, paragraph 10A, "The defendant
agrees that in determining the sentence the Court may consider
the dismissed counts in determining the applicable sentencing
guidelines range, where the sentence should fall within the
applicable guidelines range, and the propriety of any departure
from the calculated range."

The defense argues that a significant variance is in
order here.  It's clear that there is no grounds for departure
under the guidelines, and no motion has been made.  But the
question of a variance is a very real one.

The defense attempts to paint a picture of a
relatively typical adolescent male behavior in sexting photos
of genitalia with the inference that such behavior is either
completely innocent or easily treatable.

But I believe that the known facts and history of this
defendant paint a darker, more sinister picture.  That picture
is one of acting out on his sexual interest in young boys,
including his cousin in Florida, the three boys in the counts
of conviction, and others that have been determined by
investigatory agencies who were contacted by the defendant.

And I have to say a word about the text messages themselves which are graphic, to say the very least.  Page 11 of the sentencing brief argues that the photos were not of explicitly sexual poses.  How you could conclude that of a photograph of an erect penis in a young boy's hand really is beyond me.

In asking for a variance the argument again focuses on some of the deficits that Mr. Gadola suffers, but as I mentioned in my colloquy with Mr. Lennon, the ABLE assessment simply didn't support that argument.  I don't think that the deficits as laid out either excuse or mitigate Mr. Gadola's behavior.  He was not forthcoming during the process of his ABLE assessment, as I pointed out earlier.  And the entire report I think is contradicted by the facts established in the history of this case.

So taking all of the circumstances of this case into account, my conclusion is that Mr. Gadola is in fact a sexual predator who not only groomed children for exploitation but on occasion when he had ability to do so acted on those influences and impulses.  I think he's a danger to the community.  I do think that in many instances the guidelines in child pornography cases are excessive, but as pointed out by Ms. Sanford, this is not your typical child pornography case.

Having said that, I think 188 months is somewhat excessive.  The defendant wants us to conclude that he has not

acted out and never would, but the evidence is otherwise.  So I think that it is inescapable to me that a period of confinement is necessary for treatment, for maturation, for coming to grips with the real world.

So pursuant to the Sentencing Reform Act of 1984, it's my sentence on Count 1 that the defendant serve 72 months, on Count 2, that he serve 72 months to be concurrent with Count 1, and on Count 3, that he serve 48 months to be consecutive with Count 2.

The term of incarceration to be followed by five years of supervised release per count to run concurrently and to be subject to the standard conditions of reporting and remaining law abiding.

Now we did provide to counsel and Mr. Gadola before this hearing an order regarding additional sentencing conditions which both Mr. Gadola and Mr. Lennon have signed and I'm signing it now for entry.

The fine in this case is waived.  Restitution is to be determined, the amount of restitution is to be determined.  I will indicate that interest on restitution is waived.  I order the mandatory special assessment of $300, $100 per count.  In addition, I order the mandatory Justice for Victims of Trafficking Act assessment of $5,000 per count for a total of $15,000.

I will make the following recommendations to the

1    Bureau of Prisons:  First, for placement in a facility that

2    will provide programming appropriate to the crimes not only

3    involving child pornography but also sexual deviancy, as well

4    as for mental health programming.

5           Mr. Lennon, does the defendant have any other requests

6    for recommendations to the Bureau of Prisons?

7           MR. LENNON:  Your Honor, one moment.

8           THE COURT:  Sure.

9           MR. LENNON:  Your Honor, just to the extent the Court

10   can nuance the recommendation.  Obviously we would like him as

11   close to home but we would certainly like the access to

12   programming to trump that request.

13          THE COURT:  Right.  I think that close to home is not

14   going to be compatible with some of those other programs which

15   are offered I think in only a couple different facilities

16   around the country.

17          MR. LENNON:  But to the extent it's two of those.

18   Thank you, Your Honor.

19          THE COURT:  Right.  Ms. Sanford, am I correct that we

20   are dismissing the original indictment and the superseding

21   indictment?

22          MS. SANFORD:  Yes, Your Honor.

23          THE COURT:  Thank you.  That motion is granted.  Where

24   are we on forfeiture?  I know there was a preliminary entered.

25          MS. SANFORD:  I anticipate that a final order will

1   come through after sentencing, Your Honor.

2           THE COURT:  Thank you.  Are there any legal objections

3   to the sentence that I have just entered other than are already

4   on the record, Ms. Sanford?

5           MS. SANFORD:  No, thank you, Your Honor.

6           MR. LENNON:  No, Your Honor.

7           THE COURT:  Thank you.  Mr. Gadola, I have to talk to

8   you about your appellate rights, although, the plea agreement

9   in this case is pretty conclusive about your appellate rights.

10  But to the extent that you retain any appellate rights on my

11  sentencing, you have two things you need to know today:  First,

12  there's going to be a judgment entered electronically today and

13  that will start a 14-day period running during which you have

14  to decide if you want to appeal.  You obviously will want to

15  talk with Mr. Lennon, Mr. Cranmer, your parents, but you have

16  to let your lawyers know within 14 days if you desire to take

17  an appeal.  If you do, your current counsel will be obligated

18  to represent you in that proceeding as well.  Do you understand

19  those two things?

20          THE DEFENDANT:  Yes, Your Honor, I do.

21          THE COURT:  Okay.  Does the government have any

22  objection to self-surrender in this case?

23          MS. SANFORD:  Your Honor, I will just note for the

24  record pursuant to 18 U.S.C. 3143(b)(1) and (b)(2) it does say

25  the Court shall order when found guilty of an offense listed in

3142(f)(1)(A), which includes the offenses to which Mr. Gadola

pled guilty, they shall be ordered to be remanded even pending

an appeal.  So I do want to note that for the record that

that's what the statute says but I will leave it to the Court's

discretion.

THE COURT:  Thank you.  Mr. Lennon.

MR. LENNON:  Your Honor, we would respectfully ask the

conditions of bond be continued.  I can assure the Court that

Mr. Gadola will report as ordered.  For the last 20 months on

home detention, my understanding there have been no, there's

been no violations.  And this would allow also for a little

better security status when he does arrive at the Bureau of

Prisons.  We would respectfully ask the Court to continue the

conditions of bond.

THE COURT:  I think that's fair enough, Mr. Lennon.

Mr. Gadola, I am going to continue your bond and let you

self-surrender.  You will be notified by the U.S. Marshal at

some point of when and where to report, and as Mr. Lennon just

indicated, it's very important that you follow those

instructions carefully.  Okay?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  If there's nothing further,

Ms. Sanford.

MS. SANFORD:  May I address just one thing regarding

bond, Your Honor?

1            THE COURT:  Sure.

2            MS. SANFORD:  Mr. Gadola is currently allowed to go

3   out for meals a few times a month.  I would ask he be contained

4   in his home detention pending custody.

5            THE COURT:  I think we will leave that in place.

6            MR. LENNON:  Thank you, Your Honor.

7            THE COURT:  Okay.  Anything further, Mr. Lennon?

8            MR. LENNON:  No, Your Honor.

9            THE COURT:  We are adjourned.

10           THE CLERK:  All rise, please.  This court is now

11  adjourned.

12           (Proceedings concluded, 10:53 a.m.)

REPORTER'S CERTIFICATE


I, Kathy J. Anderson, Official Court Reporter for the United States District Court for the Western District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a full, true and correct transcript of the proceedings had in the within entitled and numbered cause on the date hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my direction.



/s/ Kathy J. Anderson

Kathy J. Anderson, RPR, FCRR

U.S. District Court Reporter

412 Federal Building

Grand Rapids, Michigan  49503